JiCIACCIO, Judge.
Plaintiff, Lee Tometich Gauthreaux, appeals from a trial court judgment rendered in accordance with the jury’s verdict in this medical malpractice action. We affirm.
In her original, first and second supplemental petitions plaintiff alleges that on June 19, 1990 she went to the emergency room at Southern Baptist Hospital with complications of throat constriction and shortness of breath and was admitted under the care of Dr. Herbert Mayer, an internist and gastroente-rologist. Under Dr. Mayer’s care, plaintiff remained hospitalized for several days, underwent several diagnostic tests and was diagnosed as having panic attacks and anxiety disorder. Ten days after her discharge, plaintiff suffered another episode of choking, shortness of breath and throat constriction. She was again admitted to Southern Baptist Hospital and, at the request of Dr. Mayer, was examined by Dr. Frank, a psychiatrist. Dr. Frank recommended that plaintiff undergo stress management treatment.
RUpon her discharge from Southern Baptist Hospital, plaintiff returned to complete her employment contract at Ingalls Shipyard in Pascagoula, Mississippi. While in Pasca-goula, she suffered yet another panic attack and was hospitalized at Ocean Springs Hospital for several days. Upon returning to New Orleans on August 3, plaintiff called Dr. Frank and scheduled an appointment. On August 7, 1990, at the urging of Dr. Frank, plaintiff voluntarily admitted herself to the Recovery Center at St. Jude Hospital for treatment of stress and throat constriction symptoms.
Plaintiff alleges that while hospitalized, Dr. Frank and the staff of St. Jude Recovery Center subjected her to treatment and medication for substance abuse and chemical dependence despite her constant assertions that she was not chemically dependent and had admitted herself for stress management. After the Recovery Center staff administered the medication prescribed by Dr. Frank, plaintiff became disoriented and incapacitated. Plaintiff further alleges that despite her confusion, she continually asserted that she had never abused alcohol or drugs. According to plaintiff, she was restricted from outside contact, making phone calls and having visitors. ' After 38 days at the Recovery Center, plaintiff was discharged.
Plaintiff alleges that following her discharge, she continues to suffer severe psychological pain and suffering, embarrassment, humiliation and trauma as a result of the confinement at the Recovery Center and has had to undergo both psychiatric and psychotherapy treatment. In addition, she has been unable to work because she has been labeled as chemically dependent.
Plaintiff filed suit against Edward Thomas Frank, Jr., M.D., individually; Edward Thomas Frank, Jr., M.D., A professional Corporation; and Legion |3Insur anee Company. She alleges that Dr. Frank breached the standard of care of a psychiatrist and was negligent in failing to obtain her informed consent for chemical dependency treatment and in misdiagnosing her as polydrug dependent.
Following a two-week trial, the jury entered a verdict in favor of plaintiff and awarded her $29,388.64, which represented plaintiffs past medical expenses. In answers to interrogatories, the jury found that Dr. Frank breached the standard of care regarding the diagnosis, informed consent, hospitalization and treatment of plaintiff and that this breach caused her damages. The jury also found that plaintiffs actions contributed *987 to her injuries and apportioned fault 30% to her and 70% to Dr. Frank. The jury awarded plaintiff no general damages for pain and suffering, past and future lost wages and loss of earning capacity. The trial court denied defendants’ Motion for Judgment Notwithstanding the Verdict and rendered judgment in accordance with the jury’s verdict.
On appeal, plaintiff raises the following assignments of error: 1) the jury erred as a matter of law in awarding special damages for medical expenses but no general damages; 2) the jury was clearly wrong in failing to award her either past or future lost wages; and, 3) the jury was clearly wrong in finding plaintiff 30% at fault.
The pertinent testimony follows.
Plaintiff testified that she experienced her first panic attack in June of 1990 and went to the emergency room at West Jefferson Hospital. The emergency room doctor examined her, prescribed Xanax for her anxiety and discharged her. Several days later, she experienced another attack with throat closures and went to the emergency room of Southern Baptist Hospital. She was admitted and placed under the care of Dr. Mayer. During her hospitalization, plaintiff | underwent several diagnostic tests, which failed to disclose the eause of her throat closures. In view of this, Dr. Mayer recommended that plaintiff see a psychiatrist and she agreed. Shortly thereafter, Dr. Frank went to plaintiffs hospital room and consulted with her for several hours. Plaintiff described him as well-dressed, professional and characterized the initial consult with him as very positive. According to plaintiff, Dr. Frank told her at that time that he believed her throat closing episodes were stress related. He questioned her at length about anger in her life. Plaintiff testified that she eventually told him she no longer wanted to talk about anger because she was not angry and that her life was great at that time. She said that he suggested that she admit herself to a psychiatric ward for a few days for stress related problems. Plaintiff testified that she was shocked by the suggestion and replied that she was not crazy. Dr. Frank then suggested that he could treat her for stress on an out patient basis but she declined. According to plaintiff, at no time did Dr. Frank mention chemical dependency or psychiatric disorder as a diagnosis. Upon her discharge, Dr. Mayer prescribed Ativan for the throat closures, which she took three times per day.
Plaintiff returned to Pascagoula to complete her contract work at Ingalls. She intended to return home to Gretna, when she experienced another attack and was hospitalized in Ocean Springs Hospital. Following her discharge, plaintiff and her husband went to see Dr. Frank at St. Jude. She told him she was still experiencing throat closures and reconsidered his suggestion that she should undergo treatment for stress. Once again, Dr. Frank recommended an inpatient hospitalization for plaintiff. Mr. Gauthreaux objected stating that he could not afford any additional hospital bills. Dr. Frank then agreed to treat plaintiff in an Rinpatient setting and accept as compensation insurance payment only. Plaintiff agreed to admit herself for a period of four or five days only, not 38.
The following day plaintiff admitted herself to St. Jude. She completed a medical history form and questionnaire. She testified that she became alarmed when she saw a document that listed the “Psychiatric Services” available at the hospital. At that time, she told the admitting nurse that she was not there for psychiatric treatment but rather for stress management. Plaintiff further testified that she was concerned because the unit had locks on the doors, and when she questioned the nurse about this, the nurse informed her that there were psychiatric patients on the floor and the locks were needed for security. She also stated that it greatly disturbed her that the door to her room could be locked from the outside but not the inside.
Regarding her specific treatment, plaintiff testified that Dr. Frank had assured her that she would not receive any medication during her inpatient stay. Yet, when she first arrived, the nursing staff gave her Phenobarbital, Corgard and Prozac. She explained that the medications made her “crazy.” Describing her first five days in the “detox” unit, plaintiff recalled that despite continuing to have panic attacks and throat closures, the *988 nurses would only administer injections of sterile water. Due to the other medications she could barely stand or walk on her own. She testified that at times she was not aware of where she was or what she was doing. Plaintiff recalled asking to see Dr. Mayer and her husband but the staff would not allow her to call or see them.
Plaintiff also testified that her treatment included group and individual therapy sessions, in addition to biofeedback sessions. The group therapy sessions usually entailed discussions on alcohol and substance abuse related issues. 16Regarding her individual therapy sessions, plaintiff testified that the therapist questioned her extensively about sexual abuse in her childhood. The biofeedback sessions with Renee Pescay were very enjoyable and relaxing, according to plaintiff.
Of significance during her hospitalization to plaintiff was a meeting she had with Dr. Frank on August 18, ten days after she had entered the Recovery Center. She testified that he came to the unit and met with her privately. Plaintiff told Dr. Frank that she wanted to leave the hospital because she was neither an alcoholic nor a drug abuser and could no longer tolerate the prescribed treatment and medications. At that point, Dr. Frank told plaintiff that she was mentally ill and had to continue the detox treatment or he would send her back to the psychiatric unit. According to plaintiff, Dr. Frank knew she was afraid of the “psych” unit because another patient had threatened her while she was there.
Plaintiffs husband, Stan Gauthreaux, attended a group/family session with her on one occasion. During the session, plaintiff started shaking uncontrollably. A nurse asked her and Stan to leave the room and put them in another room within view of the nurses’ station by themselves. They noticed Dr. Frank sitting in the adjacent nurses’ station. According to plaintiff, Stan went to the nurses’ station several times and asked Dr. Frank to check on her, but he offered no assistance.
Plaintiff testified that Dr. Frank came to the unit only five or six times during her 38 day stay but, Dr. James Todd, his assistant, saw her almost everyday. Dr. Todd often hollered and cursed at her and smelled of alcohol when he came to her room. When she inquired if she could discontinue the prescribed medications, he replied no. Plaintiff testified that Dr. Todd also ^characterized her as being “hysterical.”
On September 13, plaintiff was discharged from St. Jude. She testified that at that time despite her discharge diagnosis of poly-drug dependency, the Recovery Center staff gave her the prescription medications that she had relinquished to them upon admission. After her discharge, plaintiff continued to have panic attacks and was afraid to leave her home. According to plaintiff, she refused to see another psychiatrist because she feared being locked in a psychiatric unit. Yet, because the panic attacks continued, she eventually called Dr. Frank and went to see him again.
Dr. Frank had prescribed Stelazine for plaintiff at the time of discharge but she refused to take it because it made her “crazy.” He also recommended that she continue to attend group therapy sessions with Diane Markel to address her unresolved grief issues as a result of her brother’s death. Plaintiff testified that Stan later brought her to two group therapy sessions but she was never allowed to address the topic of her brother’s death.
In November, plaintiffs mother went with her to St. Jude to review her medical records. It was then that she first saw a diagnosis of chemical dependency. Plaintiff testified that this made her “mad as hell” so she decided to confront Dr. Frank. In the meantime, she had received a call from Dr. Chris Barrilleaux’s office regarding nonpayment of a claim by her insurance company. Dr. Bar-rilleux had interviewed plaintiff and completed her medical history form at the time of admission. Plaintiff testified that she spoke to Dr. Barrilleaux personally and told him that she had discovered that he had sent a claim form marked with the diagnosis “chemical dependency” to the insurance company seeking payment. She further testified that she informed him that she would notjgpay it because she was neither “chemically dependent” nor treated for “chemical dependency.” *989 According to plaintiff, the insurance company refused to pay the bill because doctors Bar-rilleaux and Frank had examined her on the same day and both submitted claim forms to the insurance company with the diagnosis of drug dependency. Plaintiff testified that the insurance company eventually paid the claim after Dr. Barrilleaux changed his diagnosis from “drug dependence, depressive disorder, and conversion disorder” to peptic ulcer.
On December 6, plaintiff went to see Dr. Frank. She confronted him about the chemical dependency diagnosis and told him that it had ruined her life and her career. When plaintiff asked Dr. Frank to correct the diagnosis, he replied that she was ill and needed to be on medication. He then handed her two prescriptions, one for Buspar and the other for Triavil. According to plaintiff these were the same drugs that had been previously prescribed for her while she was in Southern Baptist Hospital. At that time, plaintiff told Dr. Frank that she never wanted to see him again.
Shortly after the December 6 meeting with Dr. Frank through the time of trial, plaintiff saw Drs. Brasted, Dixon, Greve and Kantack. She testified that she sought treatment from them for her anxiety, panic attacks grief and anger as a result of her treatment by Dr. Frank. Describing her present mental condition, plaintiff testified that she occasionally suffers panic attacks for which she takes medication. She also takes Xanax for anxiety.
Regarding her employment status from the time of her discharge from the Recovery Center through the trial, plaintiff acknowledged that in 1992 she applied for a job at Avondale Shipyards but withdrew her application because she was afraid a required background security cheek would disclose the “polydrug 19dependency” diagnosis by Dr. Frank and the disclosure would affect her ability to get any type of job requiring security clearance. Plaintiff testified that since her discharge from St. Jude she has refused to apply for any position in the marine defense industry because she fears she will not get security clearance. She has, however, completed licensed practical nurse training and is presently employed as a L.P.N. at a local nursing home, a job that she enjoys.
Dr. Herbert Mayer, an internist and gas-troenterologist, examined plaintiff when she entered the emergency room at Southern Baptist Hospital on June 18, 1990. Plaintiff arrived at the hospital with complaints of choking and shortness of breath. At that time, Dr. Mayer had plaintiff undergo a series of diagnostic tests and physician consults. Dr. Thiele, a pulmonologist, examined plaintiff, administered several tests and determined that her breathing difficulties were not asthma related. He determined that plaintiff had “hysterical dysphonia” or a change in the pitch of the tone resulting from anxiety or panic and prescribed Buspar, an anti-anxiety drug. Because plaintiff also complained of numbness in the right side of her neck, Dr. Oser, a neurologist examined her but found no neurological cause for plaintiffs choking and shortness of breath. Also at the request of Dr. Mayer, Dr. Ray Lous-teau, an otolaryngologist, examined plaintiff and concluded that her symptoms were not related to any disease process that involved the head, ears, nose and throat.
Dr. Mayer testified that after a thorough medical evaluation, he concluded that plaintiffs symptoms were psychiatric in nature. He believed plaintiffs situation was urgent as her symptoms had incapacitated her to the extent that she had to seek emergency care on two separate occasions within three days and was unable to work. In reviewing his progress notes, Dr. Mayer documented that ioplaintiff had deeply rooted personal problems which she was not willing to address. Specifically, he noted that she had problems with her mother, father, daughter, husband and brother. He characterized plaintiff as a regimented, goal oriented individual who welcomed challenges and was very demanding. According to Dr. Mayer, plaintiffs failure to control her environment triggered her panic attacks. In his opinion, plaintiff suffered from depression and it greatly interfered with her quality-of life.
Dr. Mayer further testified that plaintiff gave him no history of having been previously prescribed Ativan and Xanax for panic attacks and anxiety by other physicians. On *990 cross-examination, he admitted that he when he prescribed Ativan for plaintiff, he was not aware that she had been using Xanax for five and one-half years. He explained that he prescribed Ativan because it is a benzodiaze-pine, which is used to treat anxiety and panic disorder. It has a muscle relaxant effect and mild sedating properties depending on an individual’s sensitivity to the drug. Dr. Mayer also confirmed that he prescribed Triavil, an antidepressant, for plaintiff to treat the depression associated with her deeprooted problems. At the request of Dr. Thiele, Dr. Mayer prescribed Buspar, another anti anxiety medication.
Dr. Mayer testified that after he and Dr. Frank examined plaintiff and consulted, there was a mutual understanding between them that plaintiff would be best served by an inpatient setting to treat her psychiatric problems. Several months after plaintiffs discharge from the Recovery Center, on January 24, 1991, Dr. Mayer sent a letter to Dr. William Brasted referring plaintiff to him as a patient, which stated “Ms. Gauthreaux does not have a history of alcohol abuse nor does she have a history of substance abuse or dependency.” In reviewing Inthe letter on cross-examination, Dr. Mayer testified that the statement was made based on the medical and drug history given to him by plaintiff. He acknowledged that he had no problem recommending and/or consulting with Dr. Frank regarding plaintiffs case.
Dr. Strother Dixon, an expert in psychiatry, testified as a witness for the plaintiff. She testified that she first saw plaintiff in February 1991 on the referral of Dr. William Brasted, a colleague. At the time, Dr. Dixon was clinical director of the dual diagnostic program at Jo Ellen Smith Hospital and specialized in addiction medicine. According to Dr. Dixon, in the three months that she treated plaintiff, plaintiff never appeared to be dependent on benzodiazepines, drug seeking, or a chemically dependent patient. Dr. Dixon acknowledged that she prescribed Si-nequan, an anti depressant, because plaintiff was depressed and could not sleep. She testified that plaintiffs experience at St. Jude was extremely troubling and the primary focus of her life. In her opinion, plaintiff had “a definite attitude about control” and felt that she had lost control while at St. Jude. Plaintiff also blamed her inability to find employment in her prior engineering field on the chemical dependent diagnosis made by Dr. Frank.
Dr. Dixon testified that clinically speaking plaintiff was not obsessivecompulsive. However, on cross-examination, she acknowledged that Dr. Frank’s primary diagnosis of plaintiff was depression and agreed that his prescribing Prozac was appropriate. As to Dr. Frank’s second admit diagnosis, panic attack and conversion reaction, Dr. Dixon admitted that these, too, were accurate.
Regarding the benzodiazepine drugs, Ati-van and Xanax, Dr. Dixon testified that these drugs can be abused. She explained that if the patient takes |12them on a regular basis longer than six to eight weeks, they could become dependent if the drugs are taken every day. She agreed with the manufacturers warning that even after relatively short-term use at the dosage recommended for treatment of transient anxiety disorders there is some risk of dependence. Also, psychological dependence is a risk with all ben-zodiazepines, including Xanax. She admitted that a person can be drug dependent without being drug seeking. In Dr. Dixon’s opinion, Dr. Frank’s discharge diagnosis of polydrug dependency was inaccurate.
Dr. William Brasted, a clinical psychologist with Jo Ellen Smith Hospital and Clinical Director of the Westbank Center for Psychotherapy who worked with Dr. Dixon, first saw plaintiff on January 9, 1991. According to Dr. Brasted, plaintiff came to him with symptoms of panic disorder. During the course of her five to six visits with him, plaintiff focused on her hospitalization and complained excessively about her treatment at the Recovery Center. Plaintiff expressed that she was extremely distressed because she believed Dr. Frank’s treatment and misdiagnosis of polydrug dependence had ruined her career as a noise/shock vibration engineer and the diagnosis affected her insurability. Dr. Brasted explained that during the sessions he tried to get plaintiff to discuss specific stress related issues as a part of her anxiety treatment but plaintiff wanted only *991 to discuss the hospitalization and its impact on her life. In reviewing his progress notes, Dr. Brasted acknowledged that he had characterized plaintiff as being “stuck” in frustration and anger.
When questioned about Dr. Frank’s admit diagnosis of plaintiff as obsessive-compulsive, Ativan dependent, conversion reaction and major depressive disorder, Dr. Brasted testified that he agreed with the diagnosis 113insofar as it listed conversion reaction. In his opinion, plaintiff was not obsessive-compulsive, Ativan dependent, and he would not have diagnosed her as having major depressive disorder. As to Dr. Frank’s discharge diagnosis of polydrug dependence, Dr. Brast-ed testified that the discharge diagnosis was inaccurate. He explained that polydrug or polysubstance dependency is a diagnosis given to individuals who are dependent on a number of different types of medications or substances for a period of six months and, in his opinion, plaintiff did not meet the criteria. On cross-examination, however, Dr. Brasted acknowledged that he was not aware that plaintiff had taken Xanax from January 1991 through May 1991 even though no physician had prescribed it for her during that period. He also testified that based on the information he received from plaintiff during treatment sessions, he believed her hospitalization at St. Jude was not helpful in treating her panic attacks but could not say it made them worse.
Dr. Douglas Greve, psychiatrist and Medical Director of East Jefferson Mental Health Center, testified that he first treated plaintiff as a patient on August 20, 1991, at Jo Ellen Smith Center for Psychotherapy, when she came to him after suffering a panic attack a few days earlier. Plaintiff gave him her personal history and told him of her hospitalization at St. Jude Recovery Center. According to Dr. Greve, plaintiff became very distraught and described her stay as traumatic. She told him that she felt stigmatized for life and that people would label her as an alcoholic and drug addict. In addition to feeling great shame and humiliation, plaintiff told Dr. Greve that she lost all self-confidence.
Dr. Greve testified that he was aware that plaintiff was given Phenobarbital while at the Recovery Center. He stated that he never used the drug but knew | i4from medical literature that some doctors use Phenobarbital to determine the level of benzodiazepine in a patient. In reading from the PDR pocket guide, Dr. Greve emphasized that “Phenobarbital should be used with extreme caution or not at all by people who are depressed or have a history of drug use.” In his opinion, plaintiff should not have been given Phenobarbital. He further testified that Dr. Frank had prescribed for plaintiff anti-depressant drugs, Prozac, Elavil, and Trofanil, and anti-psychotic drugs, Trilafon and Stelazine. However, on cross-examination, he acknowledged that his testimony was based on what plaintiff had told him. He admitted that he had not thoroughly reviewed plaintiffs Recovery Center medical records that indicated she was never given those particular drugs.
Based on plaintiffs history and his evaluation, Dr. Greve did not find plaintiff to be an alcoholic, substance abuser or substance dependent. He diagnosed plaintiff as having panic disorder. In his opinion, plaintiff did not suffer from major depression, obsessive-compulsive disorder, and was not psychotic. Dr. Greve opined that plaintiff should not have been hospitalized at St. Jude and that the experience caused her considerable damage.
Dr. Greve characterized plaintiff as pleasant but “very controlling and difficult at times.” His diagnostic notes revealed that often during her treatment sessions, plaintiff refused to relinquish control. He explained that plaintiff tried to conduct the entire session and discuss only those issues which she thought were important. Dr. Greve prescribed a mild dosage of Xanax, a quarter milligram four times a day, to treat plaintiffs anxiety. He explained to her that if she took the drug over a long period of time she could become dependent on it. According to him, after seeing plaintiff several visits later, she had taken only hsone Xanax. He acknowledged that she refused to take the medicine on a regular basis, as he had prescribed. Dr. Greve testified that he told plaintiff that she had to take the medicine as prescribed to *992 treat her anxiety, and to not do so would make her condition worse.
Dr. Paul Kantack, a psychiatrist and plaintiffs treating physician at the time of trial, testified that he began treating plaintiff in June 1992. He described plaintiff at that time as an “emotionally hemorrhaging” person. Like Drs. Dixon, Brasted and Greve, Dr. Kantack testified that plaintiffs memories of her experience at the Recovery Center consumed her life. She was angry with Dr. Frank and his diagnosis of her as poly-drug dependent. She blamed the loss of her career as a noise/shock vibration engineer on Dr. Frank’s labeling her as chemically dependent.
Based on his evaluation of plaintiff, Dr. Kantack diagnosed her as having post-trau-matie stress disorder as a result of her hospitalization. He testified that plaintiffs 38-day stay left an indelible mark on her. Once an upwardly mobile career woman, plaintiff became insecure and agoraphobic. Dr. Kan-tack testified that plaintiff developed marital problems after her hospitalization. According to him, plaintiff blamed her husband for not taking her from the Recovery Center. She felt as though her husband had abandoned her and she could no longer trust him.
In Dr. Kantack’s opinion, plaintiff was not dependent on benzodiazepines, or any other chemical substance. He did not agree with Dr. Frank’s assessment that plaintiff was depressed or had conversion reaction. While he testified that plaintiff was not obsessive-compulsive, he did admit that she had obsessive-compulsive disorder features and characterized her as “neurotic.” According to |i6Pr. Kantack, plaintiffs panic attacks were worsened due to her hospitalization at St. Jude. However, he readily admitted that plaintiff suffered from generalized anxiety disorder long before being admitted to the Recovery Center.
Dr. Kantack opined that Dr. Frank breached his duty to plaintiff in the examination and evaluation process. He testified that Dr. Frank did not conduct a thorough evaluation of plaintiff prior to hospitalizing her. Reviewing her medical records from St. Jude, Dr. Kantack concluded Dr. Frank did not comply with the hospital’s regulations which required the admitting physician to certify daily the need for continued hospitalization of a patient and the attending physician to sign off on the discharge summary. These were not done in plaintiffs case. In addition, Dr. Kantack found Dr. Frank breached the standard of care of a psychiatrist insofar as he discharged plaintiff from the Recovery Center without scheduling follow-up appointments.
Regarding plaintiffs claims that Dr. Frank had an economic motive in hospitalizing her in the Recovery Center, Dr. Kantack testified there was an unconscious motivation on the part of Dr. Frank to keep maximum occupancy at the unit. He explained that Dr. Frank had contractual obligations to fulfill with St. Jude as director of the chemical dependency unit and clinic. However, he stressed on cross-examination that he was not alleging that Dr. Frank was engaged in fraudulent activity in order to collect money from insurance companies.
Defendant, Dr. Frank, testified that he first saw plaintiff on June 28, 1990. According to Dr. Frank, plaintiff gave him a history of benzodiazepine use prior to her admission to Southern Baptist Hospital emergency room on June 15. She also told him that she had discontinued drinking alcohol because it made her losejncontrol, a feeling she did not like. Plaintiff told Dr. Frank that her mother was an alcoholic, although she did not start drinking until late in life. As to her employment, plaintiff disclosed that she had great anger and resentment over the loss of her job as a noise, shock, vibration engineer at Avondale, more than three years earlier. She told him that she had problems with her male peers at Avondale who, she believed, treated her differently. Plaintiff was greatly depressed that Avondale had laid her off, obviously failing to recognize her great value to the company, her long hours of uncompensated work, and dedication. Dr. Frank testified that as a result of this experience plaintiff “disassociated,” experiencing an anxiety type reaction where the events of her discharge did not feel real. He explained to her that after several years, she was still devastated, upset and anxious; the experience stayed fresh in her mind. Her anger was *993 further compounded by the stress she felt from her work contract with Pascagoula Shipyards that began on May 10,1990.
As part of her personal history, plaintiff told Dr. Frank that she was angry over her mother’s recent disclosure that plaintiffs father, who had raised her, was not her biologicaL father, and her mother refused to reveal the identity of her biological father. During her initial interview, plaintiff also told Dr. Frank that she was physically and sexually abused as a child, had a very poor relationship with her mother, was physically abused by her first husband and verbally abused by her second husband. In reviewing his notes, Dr. Frank testified that he documented in his consult “angry lady, bottled-up inside, swallowing her anger.” After the initial consult, he diagnosed dysthymic disorder and panic disorder.
Dr. Frank further testified that he diagnosed plaintiff with an obsessive compulsive personality disorder, characterized by an unreasonable insistence that | ^others submit exactly to her way of doing things. She needed to be in control of all things at all times. According to him, plaintiff was a perfectionist who placed unreasonable demands on herself.
The latter part of the first consult, Dr. Frank reviewed plaintiffs hospital chart and talked with her treating nurses. He testified that the nurses expressed their concern over the way plaintiff was taking her IV Ativan prescribed by Dr. Mayer. The nurses told Dr. Frank that plaintiff wanted the Ativan before it was due, more frequently than ordered, and in the absence of any panic attack. Moreover, she would not accept Dr. Lousteau’s medical explanation that her throat was not closing and insisted on IV Ativan. Dr. Frank testified that based on the nurses’ reports, plaintiffs past history of discontinued alcohol use as a result of loss of control, prior benzodiazepine use and her family history of alcoholism, he had considered the possibility of an early chemical dependence at that time.
Dr. Frank offered plaintiff an in-patient stay because, in his opinion, she appeared very close to a nervous breakdown. He testified that plaintiff refused, telling him her situation was not serious. - Dr. Frank explained that, contrary to plaintiffs claim, he had never offered her a “stress management” program because there was no such option. According to him, after consulting with Dr. Mayer, “there was a mutual understanding that plaintiff would best be served by going into an in-patient setting” for treatment of psychiatric problems, specifically, depression. Because plaintiff refused any in-patient treatment, Dr. Mayer discharged her on the anti-depressant, Triavil, and the anti-anxiety medications of Xanax and Buspar.
Dr. Frank testified that he did not see plaintiff again until August 6, 1990, Rafter she had experienced another panic attack and was admitted to Ocean Springs Hospital from July 20 B25,1990. Upon her discharge from Ocean Springs Hospital, she went back to Southern Baptist and saw Dr. Frank. During her visit, she completed a “Symptom Checklist Form,” answering affirmatively to the following: feeling tired most of the time, even without having worked; irritable, upset over little things that normally do not bother me; breaks into tears without knowing why; a complete loss of interest in sex; headaches, severe at times; lack of enthusiasm; inability to enjoy things; inability to concentrate or make decisions; inability to get things done; “crawling around to do her housework;” just staying in bed; and cooked dinner only once since her Ocean Springs discharge; anxious, tense, nervous, unreasonable fears, and having panic attacks. At this visit, she neither mentioned a death in her family that occurred the day before nor reported the event on the questionnaire. Dr. Frank testified that he discussed with plaintiff her depressive, disabling symptoms as she had reported on the symptom checklist. According to him, plaintiffs depressive symptoms had worsened and developed into major-depression since the last time he saw her. Furthermore, despite her taking Ativan, the panic attacks continued. In view of this, Dr. Frank made a second diagnosis of conversion reaction as the basis for her admission to St. Jude.
As to Dr. Frank’s diagnosis of Ativan dependence, he testified that he arrived at this conclusion based on plaintiffs prior medical *994 and personal history. Plaintiff told Dr. Frank that she would take Ativan three times a day, as prescribed. On “bad spell” days she would take more. She told him that she felt out of control, intoxicated and non-functional as a result of taking more medicine than prescribed. According to her, the medication was not working, Robut she continued to take more and this bothered her. Dr. Frank testified that he discussed plaintiffs excessive use of Ativan with her at the pre-admission visit and specifically documented atop the checklist, “she knows she is dependent on Ativan.” Thus, he listed “dependence on Ativan and Xanax” as a third admitting diagnosis in his psychiatric admission history.
In defending the third diagnosis, Dr. Frank explained that the criteria of the DSM-III-R neither require a specific amount or a large amount of pills before dependence can be diagnosed. The clinically significant factor in determining dependence is a patient’s brain’s chemical reaction to the drug. He further explained that “excessive” or “overdose” are not defined in terms of quantity, but in terms of the degree of impairment to an individual. In Dr. Frank’s opinion, plaintiff took enough Ativan to render her dysfunctional. Although he opined plaintiff was drug dependent, he did not express an opinion that she was “drug seeking.” In any event, Dr. Frank specifically told plaintiff that he was concerned about the way she was taking her pills, and advised her against further use. He again offered to help her get off the addictive benzodiazepines and she voluntarily agreed to admit herself to the Recovery Center.
While Dr. Frank testified that plaintiff was dependent on benzodiazepines he emphasized that her primary admission to St. Jude was psychiatric in nature. He explained that the “chemical dependency” admitting diagnosis on plaintiffs Admission Face Sheet was not his admitting diagnosis but rather was entered by the hospital’s business office in error. He further testified that he never diagnosed plaintiff as being an alcoholic nor did he ever recommend that she be treated for alcohol abuse.
Michael Lawrence, President and Chief Executive Officer of Total Benefit 12iServices, plaintiffs health care insurer, verified that Dr. Frank’s admitting diagnosis was not “chemical dependency.” Mr. Lawrence testified that Dr. Frank’s submitted bill correctly identified his admitting psychiatric diagnosis of “Major Affective Disease, Depressed, without Psychosis,” which was consistent with his first-ranked diagnosis appearing in plaintiffs psychiatric admission history. According to Mr. Lawrence, the hospital’s business office’s decision to list “chemical dependency” as the admitting diagnosis could not be attributed to Dr. Frank. In addition, Mr. Lawrence verified Dr. Frank’s claim that plaintiff was never offered treatment for “stress management.” He testified that Total Benefits did not cover any in-patient stay for stress management. He explained that an admission for purely stress management or relaxation purposes would be “a red flag” diagnosis for which the insurer would never pay. Mr. Lawrence testified that he ’ reviewed plaintiffs hospital bill, found no irregularities, and paid the bill, as he did with Dr. Frank’s invoices.
Dr. Frank also testified that plaintiff voluntarily admitted herself to the St. Jude Recovery Center, a dual diagnostic unit. He testified that he explained to plaintiff that she could leave the hospital at any time but the hospital asked that she sign a 72-hour notice form, which could never legally be withheld from her. He also explained that the hospital required that he certify she was competent to voluntary admit herself. He also testified that he told plaintiff that if she were to leave the hospital on a pass, she was not compelled to return to St. Jude, because there was no judicial commitment, Physician’s Emergency Certificate, or court order mandating a hospital stay. According to Dr. Frank, he never attempted to keep plaintiff against her will; she was free to leave at any time. As part of the admission process, plaintiff signed a “Request for Voluntary Admission” form, |22which was admitted as plaintiffs exhibit one at trial. The form, which bears plaintiffs signature, certified that plaintiff had been informed and fully understood the voluntary nature of her ad *995 mission. Additionally, the form specifically outlined the 72-Hour Notice provision.
As to plaintiffs treatment and stay at the Recovery Center, Dr. Frank described the dual diagnostic unit as a special multi-modality unit designed to handle patients with more than one diagnosis, such as depression, codependency, anger, anxiety, relationship problems, and other psychiatric disorders, in addition to chemical dependency. Plaintiff received 16 biofeedbaek sessions to recognize and reduce her anxiety, stress, and tension. Her hospital stay also included individual and group therapy sessions, which addressed issues of guilt, grief and loss, co-dependency, chemical dependency, and family and personal relationships. In addition to therapy, the treatment plan included a 12-step program for dependence, and Al-Anon group meetings to address the patient’s problems resulting from alcohol dependence by other persons. According to Dr. Frank, plaintiffs Treatment Team Plan identified all of her problems, including suppressed feelings, loss, grief, anger, resentment, depression, panic attacks, anxiety, and co-dependency. Nonetheless, he emphasized that plaintiff was never treated for alcoholism.
Dr. Frank testified that while he was primarily responsible for prescribing plaintiffs medications, Diane Markel was responsible for her psychotherapy and Renee Pescay conducted biofeedback sessions. In addition, Dr. Jimmy Todd, a retired OB-GYN certified in addiction medicine, assisted Dr. Frank. Specifically, Dr. Todd followed up on plaintiffs medical complaints, performed daily cheeks, and charted the progress notes.
123As to the medications he prescribed for plaintiff during her hospitalization, Dr. Frank testified that he prescribed Phenobarbital in very low doses to prevent seizures after discontinuing benzodiazepines. For a period of five days, Dr. Frank prescribed a total of 390 mg, explaining that the PDR recommends a daily maximum of 400 mg. For plaintiffs panic attacks, Dr. Frank prescribed Corgard, a drug used to lower blood pressure and block adrenaline. Plaintiff took a very low dose for a period of eight days but Dr. Frank discontinued it after she complained of side effects. For a period of nine days, plaintiff took Prozac, a drug commonly prescribed for depression and panic attacks. After plaintiff stopped taking Prozac and Corgard, Dr. Frank prescribed Trofanil and Stelazine. Again, plaintiff complained of side effects after taking these for one day, so Dr. Frank discontinued them. Dr. Frank testified that due to continuing bouts with depression, he attempted to prescribe Prozac again but plaintiff rejected it after one dose. Dr. Frank testified that plaintiff was curious as to the medications he had prescribed and so he made the PDR available for her review, which she referred to often.
Dr. Frank testified that he was out of town on September 14, 1990, the day plaintiff was discharged from the hospital. Due to his absence, Dr. Todd handled plaintiffs discharge. In connection with the discharge, Dr. Todd wrote a discharge note in the Physicians Progress Notes on September 14, which addressed plaintiffs chemical dependence. Dr. Frank explained that because Dr. Todd did not treat plaintiffs psychiatric disorders of- depression, conversion reaction, and obsessive-compulsive personality disorder, he did not comment on these in the discharge summary. According to Dr. Frank, another hospital error prevented him from completing a discharge summary on plaintiff. He explained |24that normally the medical records are sent from the nurse’s station to the medical records office and from there the entire record is placed in the admitting physician’s box for his or her review, correction, and dictation of the final discharge summary. At that point, Dr. Frank would have addressed the primarily psychiatric bases of plaintiffs admission ahd outlined her inpatient treatment for these problems. According to Dr. Frank, a hospital employee did not forward the record for his review. He further explained that due to this error, the discharge note of Dr. Todd, reflecting appellant’s discharge summary of “polydrug dependency” remained as the sole document reflecting only a portion of plaintiffs treatment at St. Jude.
As Dr. Frank recalled, plaintiffs post-hospitalization treatment included follow up therapy sessions with Markel. However, plaintiffs outpatient records indicated that *996 she attended only one session. In reviewing Ms records, Dr. Frank testified that plaintiff called him on October 22, wanting to start medications. At that time, he prescribed 12 Trofanil tablets and 12 Stelazine tablets for her depression and panic attacks. Subsequently, she contacted Dr. Frank on November 5 and December 6, 1990, for refills of the medication. Contrary to plaintiffs assertion that she had a heated confrontation with Dr. Frank on December 6, regarding the incorrect diagnosis of chemical dependency, he testified that it was a pleasant meeting. His notes from the meeting indicate that plaintiff had commented on an upcoming trip to Arizona and her plans to travel with her husband. Moreover, the out patient note reflected plaintiffs improvement. He testified that her Second Symptom checklist taken on December 6 had no reported symptoms of depression.
Diane Markel, a clinical social worker, testified as an expert and fact|25witness. Mark-el testified that she was a staff social worker at St. Jude Hospital and first saw plaintiff when plaintiff admitted herself on August 8, 1990. Plaintiff gave her general background information and disclosed that she was grieving from five significant losses in her life since 1982. Plaintiff also told Markel that she was taking Ativan for her throat closures and wanted to know why her doctors had prescribed addictive medications for her. According to Markel, plaintiff did not want to take responsibility for her drug use but rather focused on the fact that her doctors had prescribed the medications for her. Markel testified that plaintiff had difficulty expressing her feelings, many of which stemmed from her childhood. Specifically, plaintiff told Markel of being threatened with a butcher knife by her mother when she was young and also of a fear of being suffocated after her parents put a blanket over her head as she laid in the bed with them. Plaintiff also confided that she had married her third husband, Stan, because she was frightened and fearful of being homeless. Markel testified that plaintiff internalized her feelings of anger, resentment, persecution, and self-victimization, stemming from her Avondale termination. In Markel’s opinion, plaintiffs failure to express herself caused her depression, anxiety attacks, migraine headaches, stoma“safer” focusing on her physical illnesses and complaints in order to avoid dealing with her underlying problems. Markel described plaintiff as “delusional,” explaining that plaintiff refused to accept reality.
Regarding plaintiffs treatment, Markel testified that plaintiff underwent individualized therapy sessions with her three times a week. She explained the therapy sessions were a “confrontation” process, in which she would tell plaintiff her concern about a particular issue and its adverse impact upon her. This rejdirecting26 of plaintiffs attention was intended to encourage her reflection and insight into her specific emotional problems and their negative affect upon her. Contrary to plaintiffs assertions that she was brow beaten, Markel testified that none of the St. Jude staff hounded or attacked her. She further testified that no one ever referred to plaintiff as a drug addict. According to Markel, the staff at St. Jude treated plaintiff for benzodiazepine dependence and not alcoholism and no one considered her to be an alcoholic. In reviewing her notes, Markel testified plaintiff stated in a family therapy session with her husband present, that her “body is addicted to medication” and she feared that her “brain will not be normal.”
Nat Smith, a substance abuse counselor at St. Jude, testified that he saw plaintiff after she voluntarily admitted herself to the hospital in August of 1990. He testified that he was responsible for orienting patients to the dual diagnostic unit. Smith stated that he specifically explained to plaintiff the 17 Patient Rights, which were outlined in the hospital document titled “Patient Rights.” According to Mm, he discussed these rights with plaintiff and expressly told her that she would retain these guaranteed legal rights throughout her hospital stay, including Patient Right No. 17, the right to be discharged at her request. At this time, he also explained to plaintiff Patient Right No. 9, which references the mental Health Advocacy Services. Smith specifically told her that this service, available to her and all patients in a psychiatric facility, would provide an attorney to her, free of charge, at any time during her admission if she had any problems with *997 discharge or wanting to leave. He explicitly told her that the telephone number and the address of this service was posted on the Unit’s bulletin board, and then showed her the board, containing the information during the orientation process.
l27Smith further testified that he then gave plaintiff a copy of this Patient Rights document and she signed it, acknowledging her receipt of a copy and an explanation of her rights. Smith signed and dated the document directly after plaintiff. Explaining the voluntary nature of plaintiffs admission and her legal rights was a routine duty that he performed on all patients, according to Smith.
As to plaintiffs claim that she was incarcerated for 38 days, Smith testified that this was not the case. He explained the chemical dependency unit remained locked for security reasons, and in plaintiffs case, she was there for only five days. For the remaining 33 days, plaintiff stayed on an unlocked unit where she could leave at anytime. Smith testified that the unit doors were locked only on the outside to prevent unauthorized entry. However, the doors were not locked from the inside. He explained that plaintiff, a voluntary patient, could have left the facility at any time. Smith also testified that plaintiff never once requested to leave or be discharged. As to plaintiffs treatment, Smith stated that she was treated for benzodiaze-pine dependence and not alcoholism. Like Markel, he testified that plaintiff was in denial as to her dependence on the benzodiaze-pine and wanted to blame her addiction on her treating physicians. As he recalled, plaintiff was a difficult patient who refused to attend therapy sessions and wanted to remain isolated.
In his defense, Dr. Frank offered the expert testimony of Dr. John Thompson, a psychiatrist in private practice at Tulane University Medical Center and Clinical Director of Feliciana Forensic Facility, a state owned psychiatric hospital. Dr. Thompson testified that he had not examined plaintiff but had thoroughly reviewed her medical records. He also testified that he was familiar with her diagnoses, as he was certified in addiction medicine and in the course of |28practice had treated many patients for substance addiction, depression, obsessive-compulsive disorder, anxiety and panic attacks.
Reviewing plaintiffs medical records from Southern Baptist Hospital, specifically from her first consultation with and examination by Dr. Frank on June 28, 1990, Dr. Thompson stated that he found Dr. .Frank’s diagnosis was correct based on plaintiffs history. He also testified that his review of plaintiffs records showed no indication that Dr. Frank had offered plaintiff stress management as a treatment option for her conditions. In view of plaintiffs personal and medical history, Dr. Frank had good reason to recommend to plaintiff an inpatient stay as a means of intensive, ,more effective treatment. He explained that while plaintiff had both physical and psychological ills, she would address her physical complaints by taking medication but would not address the underlying psychological issues. For example, when plaintiff had a panic attack or throat closure episode, she sought immediate relief by taking Ativan and Xanax. He explained that these two drugs, benzodiazepines, provide almost instant relief, whereas anti-depressants take a while to build up in one's system before they can relieve panic and depressive symptoms. According to him, it is common for patients with panic attack symptoms to become dependent on the benzodiazepines. They seek immediate relief for physical symptoms by taking a pill and never seek long-term treatment for the underlying causes of them illness. Because plaintiff exhibited this type of behavior, Dr. Thompson testified that Dr. Frank could more easily determine and regulate plaintiffs use of medication in an inpatient treatment setting.
Dr. Thompson testified that it was significant that plaintiff had contacted Dr. Frank following her hospitalization in Ocean Springs Hospital for another |29panic attack. In his opinion, plaintiff knew she needed extensive treatment and could no longer handle her problems by herself. He further testified that plaintiffs records indicated that she voluntarily admitted herself into St. Jude Hospital and that she could have left at anytime. As to Dr. Frank’s treating diagnoses of plaintiff as drug dependent, obses *998 sive-compulsive personality disorder, anxiety and depression, Dr. Thompson opined that plaintiffs medical records and personal history supported the diagnoses.
Dr. Thompson disagreed with plaintiffs claim that Dr. Frank admitted her solely to put her on the chemical dependency unit. He explained that Dr. Frank’s orders alone indicated that plaintiff was not treated strictly for chemical dependency. Dr. Thompson testified that Dr. Frank prescribed a host of different treatments. These included antidepressant medication for her depression; safe detoxification within a reasonable period of time; individual and group therapy; and biofeedback. According to him, plaintiffs stay was at a dual diagnostic unit and not a chemical dependency unit. He emphasized that the unit addressed plaintiffs physical and psychological problems, treating the whole patient and not just a particular diagnosis. The unit provided her the medications she needed while tapering off the problematic medications. In Dr. Thompson’s opinion, the approach was reasonable. He also testified that her treatment was not consistent with one prescribed for treatment of alcoholism, refuting plaintiffs claim that Dr. Frank misdiagnosed her as an alcoholic. Dr. Thompson also testified that based on his review of her records, plaintiff was not forced to undergo therapy, overmedicated, threatened, locked-up or brow beaten while hospitalized at St. Jude. Furthermore, in his opinion, Dr. Frank did not breach the standard of care of a psychiatrist in treating plaintiff.
lapln her first assignment of error, plaintiff argues that the jury erred in not awarding her general damages where it awarded her special damages, relying on the case of Odendahl v. Wild, 418 So.2d 36 (La. App. 4th Cir.1982). Defendants, on the other hand, argue that plaintiff misstates the actual rule which holds that general damages must be awarded for injuries that present objective symptoms of pain and suffering where special damages are given. In support of their position, defendants cite Olivier v. Sears Roebuck & Co., 499 So.2d 1058, 1063 (La. App. 3 Cir.1986) and Coleman v. U.S. Fire Ins. Co., 571 So.2d 213, 215 (La.App. 3 Cir. 1990).
The issue of whether the plaintiff suffered any damages from the admission to the Recovery Center is a factual one to be determined by the jury. The jury’s factual determinations may not be disturbed on appeal unless they are manifestly erroneous/clearly wrong. E.g., Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173 (La.1993). Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993). Thus if the jury’s finding of fact is reasonable, it must be upheld upon appeal. Id.
We are aware of the general rule set forth in Odendahl v. Wild, supra, that it is an error of law for the trier of fact to award medical expenses but none for general damages. In that case, the court found that the plaintiff had proven that she suffered a lower back sprain that caused pain and suffering for months and for which she incurred the medical expenses awarded. There was also no issue as to causal connection between the accident and the injury. In Olivier v. Sears Roebuck & Co., supra, however, the appellate court held that the general rule did not apply where the evidence furnished a reasonable factual basis for the jury’s finding that the plaintiff had not sustained injuries to her neck, arms andhishoulders as a result of the accident where she had a history of arthritic problems in those areas which were unrelated to the accident.
Most recently in Tchiblakian v. State Farm Mutual Automobile Insurance Company, et al, 97-2287 (La.App. 4 Cir. 4/8/98), 711 So.2d 360, rehearing denied, we upheld a jury’s award to a plaintiff for medical expenses but no general damages, where the jury apparently found the plaintiffs testimony was not credible. In that case, plaintiff filed suit for damages sustained in a car accident. The jury awarded the plaintiff medical expenses of $12,000 and no other damages. On defendant’s post-trial Motion for Judgment Notwithstanding a Verdict, the trial judge, sua sponte, awarded plaintiff $25,000 in general damages pursuant to Odendahl. We vacated that part of the trial court’s judgment, and after reviewing the entire record, particularly the plaintiffs testimony and the jury’s answers to written inter *999 rogatories, found the jury did not err in awarding the plaintiff medical expenses but no general damages. The record clearly supported the conclusion that plaintiffs back pain and mental condition were not the result of the accident.
In this case, we find the general rule is not applicable in view of the jury’s response to written interrogatories. Specifically, jury interrogatory no. 6 asked, “What do you find to be the amount of Lee Gauthreaux’s damages (if any)?” The jury answered as follows:
a. Past medical and hospital expenses: $ actual
b. Pain and suffering, physical and mental: $ 0
c. Past and future lost wages: $ 0
d. Loss of earning capacity: $ 0
The most logical explanation for the award based on our review of the record is that the jurors were convinced that plaintiff had sustained no objective |S2injuries as a result of her hospitalization at St. Jude and treatment by Dr. Frank and intended only to award plaintiff a reimbursement or refund for her dissatisfaction with the medical services. The jury was presented with mixed factual circumstances and medical testimony. That plaintiff voluntarily agreed to admit herself for treatment to the Recovery Center based on Dr. Frank’s suggestion was undisputed. It was also undisputed that, in addition to suffering from generalized anxiety disorder, plaintiff had sustained numerous panic attacks and had a lengthy history of unresolved emotional issues relating to family, work, marriage and daily living prior to her admission to St. Jude. Nonetheless, there was an abundance of conflicting testimony as to plaintiffs admit and discharge diagnoses, the course of treatment, plaintiffs reaction to the treatment and medication, and her present mental and physical state as a result of the treatment. The testimony of several of plaintiffs expert witnesses, some her treating physicians, disclosed that they based their diagnoses on incomplete medical and personal histories from the plaintiff. Like the juries in Olivier and Tchiblakian, the jury concluded that there were no objective injuries sustained by plaintiff as a result of her hospitalization for which to compensate plaintiff. The jury’s finding is reasonable and will not be disturbed on appeal.
Plaintiff asserts in her second assignment of error that the trial court was clearly wrong in failing to award her either past or future lost wages. She claims that because of Dr. Frank’s diagnosis of her as “polydrug dependent” she is no longer able to work as a noise, shock, and vibration engineer because she can no longer obtain the necessary security clearance.
In support of her claim, plaintiff offered the testimony of Dick Christie, a special agent with the Defense Investigative Services, responsible for conducting LgAvondale security clearances on behalf of Department of Defense. Christie testified that Dr. Frank’s diagnosis of polydrug dependency would, in his opinion, most likely deny plaintiff the security clearance needed to work as a noise, shock and vibration engineer in shipbuilding for government defense projects. He explained that all employment decisions in the marine defense industry are subject to required security clearances. Christie also testified that plaintiff consulted with him regarding her application for a job at Avondale in October 1992. He testified that he told her that she would most likely be denied security clearance based on her medical history at St. Jude Recovery Center. Christie further advised plaintiff that, if offered the position, she should withdraw her application rather than compromise her reputation and risk rejection by not getting the required security clearance. Based on his advice, plaintiff withdrew her application. On cross-examination, however, Christie acknowledged that he could only begin a process of security clearance for an individual actively employed, explaining the process was too expensive and lengthy to spend time on applicants. He also acknowledged that numerous psychiatric disorders would foreclose security clearances in some eases. Christie also admitted on cross-examination that he knew of cases where individuals with chemical dependence diagnosis had been granted security clearances.
Under cross-examination, plaintiff admitted that she was laid off from Avondale in June 1987 from the position of noise, shock and vibration engineer. Following her termination from Avondale, she had job offers in the same field in California, Florida and *1000 Virginia, but chose not to accept the positions because she had remarried and wanted to spend more time with her daughter. She testified that she did not re-enter the job market until May 1990 when she contracted with 1.^Pascagoula Shipyards to train as a shipbuilding supervisor on a project. Because of her panic attacks, she could not complete the job.
Two years after her discharge from St. Jude Recovery Center, plaintiff responded to a newspaper advertisement from Avondale’s Gulfport location. The interviewing engineer, Nils Groeneng, testified that he was willing to recommend plaintiff for the position based on her experience at Avondale in the mid-1980’s. However, as he explained to plaintiff, the hiring authority rested with his boss, Carroll Blanchard. According to Blanchard, the position required a four-year college degree in engineering, which plaintiff did not have. For this reason, she could not be hired. Before she was informed of the decision not to hire her, plaintiff withdrew her application.
Contrary to plaintiffs claim, security clearance was not a condition of her employment application in 1992, according to Groeneng. He explained that an offer of employment and subsequent need for security clearance were two entirely different issues and clearance could not be used as a discriminating factor in the application process. Significantly, Groeneng testified that there would be no need reason to initiate security clearance for plaintiff, in the absence of a job offer.
It is well settled that a court of appeal may not set aside jury’s finding of fact in the absence of manifest error, and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989), writ denied, 561 So.2d 105 (La.1990). After reviewing the testimony in the record we cannot say that the jury was clearly wrong in not awarding plaintiff past or futurejjtflost wages. There was ample testimony that Dr. Frank’s diagnosis of plaintiff as polydrug dependent did not ruin her career as a noise, shock and vibration engineer. Prior to her hospitalization, plaintiff chose not to work as a noise, shock and vibration engineer when jobs were available. In addition, the testimony disclosed that, despite Groeneng’s willingness to recommend plaintiff for the position, had plaintiff not voluntarily withdrawn her application for the job at Avondale in Gulfport in November 1992, she would not have been hired because did not have a college engineering degree. This assignment of error has no merit.
In plaintiffs third assignment of error, she argues that the jury erred in finding her 30% at fault. She contends that based on its finding that Dr. Frank was negligent and breached the standard of care, the jury should have found him 100% at fault.
The apportionment of fault among co-tortfeasors is a finding of fact that will not be set aside on appeal unless found to be manifestly erroneous. Efferson v. State, Through Department of Transportation & Development, 463 So.2d 1342 (La.App. 1 Cir.1984), writ denied 465 So.2d 722 (La.1985); Rosell v. ESCO, supra.
In Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985), the Supreme Court looked to the Uniform Comparative Fault Act, Section 2(b) and Comments (as revised in 1979) for guidelines in apportioning fault. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed.
136Watson, 469 So.2d at 974.
There is ample medical testimony and other evidence that plaintiff did not comply with her treating physicians’ orders regarding use of medication. Prior to her hospitalization at St. Jude, plaintiff took prescribed Xanax and Ativan only when she thought she was having a panic attack. While in St. Jude, she did not comply with the prescribed treatment plan. She rejected medications necessary for her panic attacks and depression, and also resisted group therapy treatment. Plaintiff admitted that after she learned of her discharge diagnosis, she was so angry *1001 she chose not to attend follow-up treatment with Dr. Frank. Likewise, she refused to attend post-discharge group therapy sessions with Diane Markel. In addition, the evidence in the record indicates that plaintiff resumed taking Xanax and Ativan several months after her discharge, even though it had not been prescribed.
The jury had the benefit of reviewing the plethora of medical evidence and hearing plaintiff and the other witnesses testify. The verdict clearly demonstrates that the jurors believed plaintiff was partly at fault for the unsatisfactory treatment she underwent at the Recovery Center. Based on our review of the evidence, we cannot say the jury was clearly wrong in apportioning fault 30% to plaintiff and 70% to Dr. Frank.
Accordingly, the judgment appealed from is affirmed.

AFFIRMED.